## THE NEWPORT NEWS.

### GOODWYN v. THE NEWPORT NEWS.

(District Court, E. D. Virginia. August 20, 1897.)

1. COLLISION—TUG AND STEAMER IN CHANNEL—FOG—SIGNALS—ERROR IN EXTREMIS.

A tug navigating in a channel in the edge of a fog bank, on perceiving a steamer approaching at a distance estimated by the tug's master at 400 yards, gave the proper signal for passing starboard to starboard. The steamer answered by two blasts of her whistle, signifying her assent. Those on board the tug testified that the answering signal was heard only as one blast, and thereupon the tug changed her course, and was run down while attempting to cross the steamer's bows. Held, that this error was not one committed in extremis, and that the tug was therefore liable for at least half the damages.

2. SAME—EXCESSIVE SPEED.

When two vessels approach each other at night in a narrow channel, under such conditions of weather as affect the visibility of lights and the hearing of sounds, there must always be some risk of collision. Held, therefore, that a large passenger steamer proceeding at over 12 miles an hour down the Elizabeth river below Norfolk, and approaching a low-lying fog bank, through which the white light of a tug was perceived, her colored lights being invisible, was in fault for violating rule 21, requiring every steam vessel, when approaching another vessel so as to involve risk of collision, to slacken her speed, and stop and reverse if necessary.

This was a libel in admiralty by Caleb Goodwyn, master of the tug Katie, against the steamer Newport News, to recover damages occasioned by a collision.

Sharp & Hughes and Whitehurst & Hughes, for libelant.
White & Garnett and Harrington Putnam, for respondent.

BRAWLEY, District Judge. The collision in the libel mentioned occurred about 6:40 p. m. on November 8, 1895, in the Elizabeth river, near Norfolk, on the reach approaching Boush's Bluff lightship. The Katie, a steam tug 91 feet in length and of 89.19 gross tonnage, having in tow a four-master schooner, left Lambert's Point that afternoon. She dropped her tow at Sewell's Point, about 5 miles distant,

and was on her return to Norfolk when the steamer Newport News ran into and sank her, two lives being lost in the collision. The testimony of all on board the Katie is that, after leaving Sewell's point, there was a thick low-lying fog, somewhat intermittent, and that, on her way down, she was going under one bell during the greater part of the time, and blowing her fog whistles. Witnesses who were on the Louise, crossing the Craney Island flats from Newport News towards Norfolk, testify to hearing the fog whistles; and it is clearly established that there was a fog between Sewell's Point and a point near where the collision took place. Goodwyn, the master of the Katie, who was in the pilot house on the starboard side, testifies to seeing the bright lights and a dim glimmer of the green light of the Newport News at a distance of about 400 yards a little on his starboard bow; that he gave the order for two whistles to be blown, and after a short interval blew two more whistles. These were the proper signals under the conditions prevailing, and the vessels should have passed starboard to starboard, and all accounts agree that there was sufficient room for the vessels to have passed safely, the dredged channel being 500 feet wide. The passing signals of two blasts given by the Katie were answered by the Newport News with two blasts. This is the concurrent testimony of all on board of the Newport News, and, as it is corroborated by independent and credible witnesses, I find it as a fact. Unfortunately, however, these answering signals were misunderstood. Those on board the Katie say that they heard but one whistle. Testimony has been offered to show that it sometimes happens that in certain conditions of the atmosphere two blasts sound as one, and that sometimes, because of water in the whistles, such confusion occurs. However that may be, the Katie, upon hearing what was supposed to be one whistle, changed her course, and, while attempting to cross the bow of the Newport News, was sunk. It is clear that the immediate cause of the collision was the crossing of signals. As these were initiated by the Katie, and properly responded to by the Newport News, and, if observed, would have allowed the vessels to pass safely, the responsibility for the collision would rest upon the Katie, unless her fault is extenuated by the circumstances surrounding her; and it is contended in behalf of the libelants that the conditions were such that any fault imputable to the Katie should be considered an error in extremis, and that the responsibility rests upon those whose omissions of plain duty brought about those conditions of extreme peril. This involves a more minute inquiry into the events immediately preceding the catastrophe, and as to the weather and other conditions prevailing.

The Newport News is a fast steamer, plying regularly between Washington, D. C., and Norfolk, carrying passengers and freight. She is about 275 feet in length, and is capable of making about 21 miles an hour. Her schedule time for leaving Norfolk is 6:10 p. m., and on the evening of November 8th she left at that hour. Other steamers of regular lines leave at and about the same schedule time, and between Norfolk and Old Point Comfort go over the same course, which passes by Lambert's Point, about 3 miles, Craney Island light about 4 miles, and Boush's Bluff light a little over 5 miles, respectively, from

Norfolk; Old Point Comfort being about 12 miles. The Newport News, proceeding at her usual speed, which is stated at from 10 to 12 miles an hour, was hauling abreast of the Boush's Bluff lightship at 6:38. The steamer Old Point, belonging to another line, leaving Norfolk about the same hour, reached the collision point a few minutes after her. The Katie, a tug engaged in and about those waters, should have expected to meet vessels about this point; and this must be considered in determining how far the suddenness of the peril mitigates the fault of her navigation. Goodwyn, her master, testifies that he saw the lights of the Newport News at a distance of about 400 yards. Estimates of distance upon the water in the nighttime upon moving vessels cannot, in the nature of things, be taken as accurate measures of distance. The condition of the weather—whether foggy or misty or rainy—accentuates the uncertainty. What men do ofttimes furnishes a more accurate means of determining the truth than what they say. Goodwyn's conduct was not that of a man confronted suddenly with impending calamity. He saw the lights. He exchanged words with the mate. He took his glasses, and saw the green light a little on his starboard bow. He gave the order to blow the passing signals. This was precisely the thing that he should have done. If he had had all the time required for cool deliberation, he could not have reached a more correct conclusion. These were not alarm whistles or fog whistles, but the signals prescribed by the rules of navigation, which would have insured safety if adhered to. The evidence sufficiently establishes a fog down the bay, but there was nothing in the condition of the weather near Boush's Bluff which prevented the visibility of lights for at least a quarter of a mile. I must conclude, therefore, that Goodwyn saw the lights of the Newport News in time to have avoided the collision, and that if he had "stuck to his two whistles," as he expressed it afterwards in the hearing of Blakey and Palmer, he would have passed safely.

The case does not fall within the principle which excuses because of error in extremis. It remains to consider whether there was any fault in the Newport News which contributed to the disaster. Much testimony was offered as to the state of the weather in and about Norfolk on that evening. While the Newport News is to be judged by the conditions prevailing where she was, and not by those existing at points at a distance from her, more or less considerable, yet the testimony is not without relevancy in enabling us to determine what was the actual state of the weather, and whether there were any circumstances which imposed the duty of unusual circumspection. It is claimed in her behalf that there was nothing in the state of the weather which required her to blow fog signals or to moderate her speed, and it is admitted that she did neither. No fog signals were given at the Craney Island lighthouse, nor at Boush's Bluff lightship. It is true that one witness, the steward of the ship, called for the libelants, testified that the fog bell was ringing; but the preponderance of testimony is that this bell was not rung before the collision, but after, and not as a fog signal, but as a warning to approaching vessels that a collision had taken place; and Lindstrom, a deck hand, on board the lightship, called for the respondents, testified that the

bell was not rung before the collision, but that the master of the ship, who had been playing cards in the cabin, went on deck about the time the Newport News was passing, and came back reporting that a fog was coming up, and that he was going to ring the bell. I am satisfied from this and other testimony that the bell was not rung before the collision.

The captain of the Newport News, his officers and lookout, all testify that there was no fog. Admiral Brown, of the United States navy, a passenger on the Newport News, saw slight evidences of a low fog as they were coming across from Portsmouth, and at Lambert's Point there was a low fog, which prevented his seeing the decking of the wharf, though he could see the lights above the wharf. He was not on deck at the time of the collision, but came out immediately after hearing the backing bells. He could see the lights of vessels anchored on the eastern side of the channel, and the lights at Hampton, 5 or 6 miles away. He could see lights in small boats 50 or 100 feet distant, but could not see the boats, and says that "the fog was thin and very low." He did not consider that the weather was such as to make navigation dangerous. Blakey, another passenger, who was on deck from the time of leaving Norfolk until very near the light-ship, and who was looking out for a view of the United States warship Columbia, testified that he could see lights distinctly all the way down. He went into the saloon just before the collision, on account of the rain, but continued to observe from that position.

Richardson, the captain of the Old Point, a steamer that left five minutes after the Newport News, says that there was a low fog at Norfolk; that he could see over it. At Lambert's Point there was some fog, and he blew his fog whistles at the turn, and the fog at that point was such that he went forward to assist the lookout. At the point of collision he says that there was a low fog on the water, that came up nearly to his pilot house, the floor of which was about 24 feet above the water, and that the fog might have been such as to obscure the view of the pilot house of the Katie, which he thought was about 10 or 12 feet above the water, and permit the view of the pilot house of the Newport News, which was about the same height as his own. Brown, lighthouse keeper at Craney Island, testified that there was no fog there, and no fog signals. All of the witnesses last named were called in behalf of the Newport News.

In behalf of the Katie, witnesses who were on board the tug Louise, passing from Newport News to Norfolk, over Craney Island flats, testify to thick fog, and to blowing of fog whistles, and to hearing the fog whistles of the Katie, estimated to have been a mile and a quarter distant. Some of these witnesses testify that, upon getting into the main channel at Craney Island light, the fog lifted, and lights were distinctly visible in the direction of Norfolk. Cadmus, who was on an oyster sloop 100 yards from Boush's Bluff light, testifies to the existence of a very thick fog. He says that the fog bell at that point was not rung until after the collision. Numerous witnesses testify to a thick fog at Old Point, at Hampton Roads, at Sewell's Point, and at Lambert's Point. My conclusion is that there was a low-lying fog, of considerable thickness, extending from Old

Point to within a half mile of Boush's Bluff lightship; that there was a fog of like character to the west of the channel, over Craney Island flats; that there was a low-lying fog at Lambert's Point, of sufficient thickness to require the customary precautions; that there was some fog at and about Boush's Bluff lightship, low-lying and thin. Neither the master, officers, or lookout of the Newport News could see the colored lights of the Katie. They testified to seeing her bright lights at a distance variously stated as from one-half to one mile distant. Had the weather been such as they describe, the bright lights should have been visible a much greater distance, and the colored lights which were of the kind required by law should have been distinctly visible more than a half mile. That they were not seen is conclusive evidence that the atmosphere was thick and hazy. The fact that the fog whistles sounded by the Katie were not heard aboard the Newport News is a circumstance to be considered. They were heard aboard the Louise as she was passing over the Craney Island flats to the westward of the main channel, and at a distance from the Katie no greater than that which separated the Newport News from her. The atmospheric conditions affecting the transmissions of sound are so imperfectly understood that the failure of those on board the Newport News to hear cannot be imputed to her as a fault, for there is no known test of the condition of acoustic opacity, the acoustic cloud not being visible to the eye or palpable to the touch; but my opinion is that the general atmospheric conditions prevailing that night in that much-frequented roadstead, in the main channel leading from the port of Norfolk, imposed upon the Newport News the duty of caution.

The twenty-first rule provides that "every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse, and every steam vessel shall, when in a fog, go at a moderate speed." The testimony shows that the Newport News was going at her usual speed in that channel, which was stated as from 10 to 12 miles an hour. As the proof shows that she made the distance between Craney Island and Boush's Bluff, a distance of 1¹/₅ miles, in five minutes, she was evidently going at a speed greater than 12 miles an hour. Her engineer testifies that her engines make 117 revolutions a minute when going at full speed of 21 miles an hour, and that they were making 70 to 75 revolutions that night. Although her engines, according to the testimony of this witness, were backing at full power 30 or 35 seconds before the collision, the momentum of the Newport News was such that she cut through the keel of the Katie about midship on the port quarter, and tore the garboard streak on the starboard side. This, certainly, was not moderate speed, and, if there was a thick fog, the fault of the Newport News would be too clear for argument. Most of the cases cited apply to cases of thick fog, and are not applicable to the conditions as found. That the Katie had passed through a thick fog bank is clearly proved; that she was on the edge of it, and not entirely out of it, when first seen by the Newport News, seems also clear, for the witness Lindstrom says that the keeper of the light at Boush's Bluff reported a fog coming up in that direction, and was about to give the fog signals.

The Newport News would have seen the Katie earlier but for this fog. When she saw the white lights, and failed to see the colored lights, this should have indicated to her that the side lights were obscured by a low-lying fog. Such fogs are not of unusual occurrence, and it is the duty of navigators to give notice of their approach to fog banks, and to take precautions against vessels that may be enveloped in fog, although they themselves may not be shrouded. But assuming that, notwithstanding the omission of the Newport News to give notice of her approach by the required statutory signals, the vessels saw each other in time to have avoided the collision, as I have already determined to have been the fact in holding the Katie at fault, was the Newport News also at fault? It is impossible to define accurately what conditions "involve risk of collision" according to the exigency of the twenty-first rule; but it would seem that there must be "risk of collision" in a case where actual collision occurs, and, unless such collision appears clearly to have been the result of some gross carelessness or flagrant misconduct on the part of the other vessel, the twenty-first rule would seem to be operative. When two vessels approach each other at night, in a narrow channel, under such conditions of weather as affect the visibility of lights and the hearing of sounds, there must always be some risk of collision; and I am of opinion that the collective result of all the testimony shows that the circumstances of this case created such reasonable probability of danger as required compliance with the rule.

Havenner, the lookout of the Newport News, testifies that the night was dark, with a "light misty rain" falling. He afterwards substituted the word "drizzling" for "misty"; but it is clear from all the testimony that the atmosphere was thick, especially near the water. The side lights of the Newport News were about 30 feet above the water; the side lights of the Katie about 12 feet from the top of the water, and none of the witnesses on the Newport News could see them. The Katie was making about $3\frac{1}{2}$ miles an hour; the Newport News, probably, over 12 miles an hour. They were approaching each other at the speed of a mile in something less than four minutes. If they saw each other at a distance of a quarter of a mile, they were less than a minute apart in time. If at half a mile, they were only two minutes apart. They were meeting nearly head on, or less than a point off. In such a roadway, on such a night, and under such conditions of visibility of lights, the peril of collision is ever present; and there should be no nice calculation that it may be avoided if measures can be taken which may diminish the probabilities or render it impossible. The rule referred to prescribes what those measures should be. "Slacken speed, or, if necessary, stop and reverse." The monarchs of the waves—fast-going passenger steamers—are naturally impatient of rules which tend to fetter their movements, and the observance of which sometimes prevents the keeping of schedules in which they have a just pride, and their passengers, through an unconscious bias, are prone to sustain them in such violations; but there can be no doubt as to the duty of courts to enforce the observance of rules which have the sanction of authority and of reason as promotive of safety.

It is to be regretted that, in a case involving so much conflict of tes-

timony, the court has not had the opportunity of observing the demeanor of witnesses to assist it to right conclusions, but having been heard by Judge SEYMOUR, whose death supervened before a decree, it has been presented upon the testimony taken before him, and upon depositions. While the testimony is greatly conflicting and unusually voluminous, the essential facts upon which the decision turns are few. The statements of the chief witnesses on either side cannot be accepted as absolute verity without rejecting the testimony of many credible witnesses not affected by the natural bias which is to be looked for in those chiefly interested. The exact spot where the collision occurred has been the subject of much contention. One would think that, in a place so much frequented, there ought not to have been much difficulty in fixing it with precision; but the only witness —Lander—who claims to have made an actual measurement fixes it at 1,045 yards from the Boush's Bluff lightship,—a much greater distance than that fixed by any of the other witnesses. The conclusion reached by me does not require an attempt to reconcile the testimony on this point. All testimony as to the exact time and place and distances of occurrences on the water at night is so uncertain that right conclusions must be the collective result of all the facts, rather than the rigid reliance upon any one isolated fact. The preponderance of testimony is that the collision occurred about a quarter of a mile from the lightship, but responsibility must be fixed by what was done rather than by where it was done. The fault is the main thing, not the place where it was committed; and the fixing of the exact spot, while important in the interest of accuracy, does not of itself point unerringly to the fault, although it may be helpful.

The immediate cause of the collision is not far to seek. It was undoubtedly the crossing of signals by the Katie. If the night had been clear, so that she could see at the usual distance the approaching vessel, there would have been no excuse for her mistake, and the loss must have rested where it fell. But the night was not clear. The lights of the Newport News were not visible at the usual distance, but were visible at such distance as enabled the Katie to determine her proper course; and, having so determined, she initiated the proper signals, which were properly answered, but, misunderstanding the response, she made the fatal mistake. If the Newport News had slackened her speed, as was her obvious duty under the circumstances, the Katie would have had time to slow down, to blow her alarm whistles, and to wait until she was assured that her initiatory signals were properly understood; but the speed of the Newport News was such that she had no time to wait, and she took the only course which then seemed to offer any hope of safety, and was run down. The original mistake being the Katie's, it must be attributed to her as a fault. That such mistake proved fatal was due to the speed of the Newport News, which, under the circumstances, must be attributed to her as a fault. Both vessels being at fault, the damages must be divided. Let a decree be entered directing a reference to ascertain the amount, and that the Newport News be adjudged liable to pay to the Katie one-half thereof; each party to pay its own costs.